UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DWAYNE A. COX,

                    Plaintiff,

        v.                                    Case No. 15-cv-395-pp

MICHAEL BAENEN, YANA PUSICH,
AMY BASTEN, RANDY MATTISON,
SCOTT LEURQUIN, SMA CONSTRUCTION SERVICES,
MIKE ABHOLD, BURT FEUCHT, and
SOCIETY INSURANCE,

                    Defendants.

## ORDER GRANTING DEFENDANTS BAENEN, PUSICH, BASTEN, MATTISON AND LEURQUIN'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 206)

Plaintiff Dwayne Cox, a Wisconsin state prisoner, filed this case alleging that the defendants violated his rights under federal and state law based on his exposure to exhaust fumes at the Green Bay Correctional Institution during a construction project.[1] Dkt. No. 1. Defendants Michael Baenen, Amy Basten, Scott Leurquin, Randy Mattison and Yana Pusich ("State Defendants") have filed a motion for summary judgment.[2] Dkt. No. 206. The court will deny the motion.

_____

[1] The plaintiff filed this case without an attorney, but United States District Judge Charles N. Clevert, Jr., who initially presided over the case, recruited an attorney to represent the plaintiff *pro bono*. Dkt. No. 162. The case was reassigned to this court on Judge Clevert's retirement.

[2] Defendants Mike Abhold, Burt Feucht, SMA Construction Services and Society Insurance ("Construction Defendants") also filed a motion for summary judgment. Dkt. No. 201. The court will address their motion in a separate order.

1

In his fourth amended complaint, the plaintiff asserts a claim for cruel and unusual punishment under the Eighth Amendment against the State Defendants. Dkt. No. 195 at 9-12. He also asserts state law claims for negligence and negligent infliction of emotional distress against the State Defendants. Id. at 12-16.

## I. FACTS

### A. Parties

The plaintiff was incarcerated at the Green Bay Correctional Institution during the relevant period. Dkt. No. 238 at ¶1. Defendant Michael Baenan was Green Bay's warden from 2011 until 2014. Id. at ¶2. Defendant Amy Basten is Green Bay's correctional services manager. Id. at ¶3. Defendant Scott Leurquin is a correctional officer and a health and safety officer at Green Bay. Id. at ¶4. Defendant Yana Pusich was a security supervisor captain at Green Bay. Id. at ¶5. Defendant Randall Mattison was employed with the Wisconsin Department of Corrections (DOC) as the agency's engineer. Id. at ¶6. Defendant Chris Timmers, who passed away on May 1, 2016, worked at Green Bay as the building and grounds superintendent. Id. at ¶7.

### B. Construction Project

Construction of a shower facility adjacent to Green Bay's North Cell Hall began in mid-November 2013. Dkt. No. 238 at ¶8. The plaintiff lived on the second level of the North Cell Hall in a cell located directly across from the exterior windows overlooking the construction project and parallel to the air

intake valves. Dkt. No. 239 at ¶1. The construction of the new shower facility took place in a "fairly narrow corridor" between Green Bay's North Cell Hall and the main kitchen. Id. at ¶2. Construction company employees and contractors used heavy machinery and power tools at all stages of the construction project. Id. at ¶4.

The plaintiff could both see and hear the construction equipment being used outside near his cell. Dkt. No. 239 at ¶5. On most days, construction work took place for about eight hours a day. Id. at ¶6. Certain equipment, such as diesel-powered ground thawing equipment, was operated at least during working hours and at one point ran constantly for a week. Id. at ¶7. Large construction machinery and tools are diesel- or gasoline-powered and discharge exhaust fumes. Id. at ¶8.

Exhaust fumes from the equipment entered the North Cell Hall through the air intakes and heat exchanges. Dkt. No. 239 at ¶9. The fumes also entered the North Cell Hall when the air intakes and heat exchangers were not in use. Id. The entry of exhaust fumes resulted in an odor being present daily and caused a visible haze in the air. Id. at ¶10. The plaintiff and other prisoners complained to prison staff about the fumes, and several filed formal inmate complaints about the problem. Dkt. No. 239 at ¶20. Prison staff submitted work orders asking that the fumes be addressed. Id. at ¶21.

The State Defendants implemented one proposed solution—turning off the air intake valves and setting up large fans—to try to mitigate the fumes. Dkt. No. 239 at ¶22. In February 2014, Green Bay maintenance staff turned off

3

the heat and put large floor fans on one tier of the North Cell Hall, near the guard's station. Id. at ¶24. Another inmate, William Ledford, testified at his deposition, and the plaintiff asserted in his declaration, that this did not prevent the fumes from entering the North Cell Hall, but spread them throughout the North Cell Hall and made the cells cold due to both wind and lack of heat.[3] Id. The plaintiff and Ledford have asserted turning off the heat in "the middle of winter, with wind chills reaching as low as -45° Fahrenheit," caused the North Cell Hall to become "extremely" cold. Id. at ¶25. They also allege that the industrial fans that were supposed to "mitigate the concentration of fumes" resulted in "significant wind in the North Cell Hall that exacerbated the cold." Id. at ¶26. The plaintiff and other inmates wore several layers of clothing to try to stay warm. Id. at ¶27. The plaintiff alleges that the fans were particularly ineffective with respect to himself because his cell was far from the guard's station, past a firewall behind which the fumes would accumulate with no means of escape. Id. at ¶28. The fumes could still be smelled and sometimes seen during this time. Id.

C.    The Plaintiff's Symptoms

 The plaintiff alleges that inmates housed in the North Cell Hall were exposed to exhaust fumes for a prolonged period. Dkt. No. 239 at ¶11. The plaintiff experienced respiratory problems, nausea, burning eyes and throat,

---

[3] William N. Ledford filed a separate lawsuit in the Eastern District of Wisconsin, Ledford v. Baenen, et al., Case No. 16-cv-665-JPS. The judge in that case granted summary judgment in favor of the defendants, and the plaintiff's appeal is pending in the Seventh Circuit.

4

and other symptoms throughout the period of construction. Id. He suffered severe headaches daily and vomited at least four times. Id. at ¶12. The plaintiff's physical symptoms are consistent with prolonged exposure to fumes containing carbon monoxide. Id. at ¶13.

In addition to physical symptoms, the fumes caused the plaintiff to experience severe emotional and psychological problems. Dkt. No. 239 at ¶14. The constant exposure to the fumes caused him to be extremely anxious, and he especially worried about how often he had to breathe in fumes containing carbon monoxide. Id. The plaintiff personally knew someone who had committed suicide by breathing in gasoline exhaust fumes from a running car, which heightened his emotional and psychological distress. Id. at ¶15. He feared that he would suffer serious, even life-threatening, harm from his exposure to similar fumes. Id.

The plaintiff's expert, Dr. Anderson, "concluded that carbon monoxide had to be the causative agent" for the plaintiff's symptoms, based on his symptoms and the conditions under which he was confined. Dkt. No. 239 at ¶54. Anderson specifically found, with a reasonable degree of certainty, that carbon monoxide exposure caused the plaintiff's symptoms. Id. While Anderson did not testify to a degree of medical certainty; he relied on his training and experience as a toxicologist to testify that the exhaust fumes likely caused the plaintiff's symptoms. Id. at ¶55. Anderson based his opinion on his knowledge of diesel and gasoline combustion, as well as the ventilation pathways present in the prison. Id. at ¶56.

5

The State Defendants admit that none of them conducted air quality testing. Dkt. No. 239 at ¶59. They assert that there is no data that shows the quantitative concentration of carbon monoxide to which the plaintiff may have been exposed or about the air quality in the North Cell Hall during the construction project. Dkt. No. 238 at ¶¶85-86. There also is no data of the plaintiff's blood levels during the construction. Id. at ¶87.

D.    The Plaintiff's Complaints About the Construction Project, Interaction with HSU, and State Defendants' Response

The plaintiff submitted a Health Service Request (HSR), dated February 2, 2014, reporting flu-like symptoms:

> Memo posted on the inst. T.V. channel advises any inmate to notify H.S.U. who experience flu like symptoms. I have a sore throat and hurts to swallow. Runny nose. I feel dizzy when I stand. Starting to develop a cough also.

Dkt. No. 238 at ¶24. A Health Services Unit (HSU) nurse saw the plaintiff the next day and he received treatment for his flu symptoms. Id. at ¶¶25-31. The plaintiff went to the HSU on the morning of February 4, 2014 and reported feeling mostly better regarding his flu symptoms. Id. at ¶¶32-33. On February 5, 2014, the plaintiff returned to the HSU, and presented with no complaints. Id. at ¶38. The plaintiff did not return to the HSU any time before he left North Cell Hall at the end of March 2014. Id. at ¶40. At the February 2014 appointments, the plaintiff did not tell HSU staff about his fear of death from being exposed to the construction fumes. Id. at ¶41. He did not bring up the fumes at his February 2014 HSU appointments. Id. at ¶58.

6

On February 6, 2014, the plaintiff completed an interview/information request form directed to Green Bay's maintenance department, writing:

> I'm sure you are well aware of the engine combustion fumes coming into the cell hall from the construction work going on right outside the cell hall. A lot of inmates are experiencing health problems due to it. Is maintenance doing anything about it? Awaiting your reply. Thank you.

Dkt. No. 238 at ¶9. The staff-response section on the request form was empty.

Id.

The plaintiff submitted another interview/information request form, dated February 12, 2014, and received by Green Bay's HSU on February 13, 2014:

> Cox: Due to the construction project going on outside the NCH, I'm experiencing nausea, vomiting, dizziness, blurry vision, headaches. Is there a cure you can provide for these symptoms? If so, I will submit a blue slip. Thank you!
>
> Staff Response: Not sure what your [sic] referring to regarding construction. If you want to be seen – place HSR [(Health Services Request)] for sick call – will be copay.

Dkt. No. 238 at ¶10.

On February 16, 2014, the plaintiff sent a letter and request slip to defendant Pusich, who was the North Cell Hall supervisor, asking her to do something about the cold and the ongoing presence of fumes. Dkt. No. 239 at ¶29. He pointed out that the attempted "solution" did nothing to alleviate the fumes and served to make matters worse:

> To date the only solution to this problem has been to run the large floor fans. This does nothing other then [sic] circulate the fumes around even more. Turning the heating system off is by far NOT the solution either with sub-freezing temps outside. . . .

7

> Therefore, with this memo I am requesting that an immediate solution be devised by G.B.C.I. staff and the contractors to deal with this serious health and safety issue other than turning off the heat or exchangers during these cold months, or using the floor fans.

Id. The plaintiff did not receive any written or verbal response to his letter. Id.

On February 18, 2014, the plaintiff and six other inmates submitted a group inmate complaint, GBCI-2014-3613, in which they complained about the "presence of toxic fumes emitting from heavy machinery and tool exhaust in the North Cell [H]all." Dkt. No. 238 at ¶¶12, 14. The plaintiff wrote that, as a result of the fumes, he experienced severe headaches, dizziness, nausea, vomiting, and breathing difficulties, and a burning sensation in the throat and eyes. Id. at ¶15. The plaintiff alleges that the next day, an HSU staff member, known to the plaintiff as "Nurse Amanda," examined him while she was handing out daily medications in the North Cell Hall and told him that several inmates were complaining to the HSU of similar symptoms each day. Dkt. No. 239 at ¶18. These inmates were told that the HSU did not have any treatment. Id.

Institution Complaint Examiner Joseph Martin investigated the plaintiff's group complaint. Dkt. No. 239 at ¶31. On February 26, 2014, after conducting some investigation, Martin rejected the complaint as having been addressed. Dkt. No. 228-19 at 19. On March 14, 2014, however, Warden Baenen reviewed the plaintiff's appeal of Martin's dismissal, concluded that the grievance was wrongly dismissed and sent it back to Martin for further investigation. Id. at 21. Martin followed up with further investigation and, on March 14, 2014, recommended that the group complaint be affirmed. Dkt. No. 227-8 at 23. On

8

March 17, 2014, however, Baenen dismissed the complaint "with modification," concluding that it had been addressed. Dkt. No. 228-19 at 25. The plaintiff was transferred to administrative segregation on March 23, 2014. Dkt. No. 229 at ¶36.

The plaintiff claims that after transferring from North Cell Hall to administrative segregation in March 2014, he no longer experienced any symptoms (except worsening eyesight based on his having to wear eyeglasses more often). Dkt. No. 238 at ¶¶44-45. Every week the plaintiff was in administrative segregation, beginning on March 24, 2014 and continuing to October 1, 2014, a medical professional visited his cell-front for medical rounds without any cost to him. Id. at ¶46. He reported no complaints, no signs of injury/illness, and no mental health concerns. Id. at ¶48.

On September 17, 2014, the plaintiff submitted an HSR to the HSU:

Cox: Are there any long term effects from exposure to carbon monoxide and or toxic noxious fumes. [sic] If so please describe what.

Staff response (9/18/2014): If you need to be seen for some concern let me know—I have nothing for you that I can send.

Id. at ¶50. The plaintiff submitted another HSR on September 18, 2014:

Cox: I asked a simple question. Are there any known long term health effects from exposure to carbon monoxide poison and noxious fumes? If so, please describe what symptoms.

Id. at ¶51. On September 19, 2014, HSU scheduled the plaintiff to be seen based on his HSR. Id. at ¶52. He refused to be seen. Id. at ¶53.

The plaintiff refused to pay a copay for a problem created by the institution. Dkt. No. 238 at ¶62.

The plaintiff never contacted the Psychological Services Unit (PSU) about his fear of dying from exposure to the fumes, either during his time in the North Cell Hall or after he left. Dkt. No. 238 at ¶64. In an October 2015 PSU appointment, the plaintiff reported that he never had experienced any mental health problems other than insomnia. Id. at ¶65.

E.    Policies and Procedures

Executive Directive #38 (Employee Work Place Safety, Loss Control and Risk Management Program) provides guidance for corrections' staff on how to handle complaints regarding potential environmental issues. As part of this directive, institutions are required to investigate and handle issues in a timely manner. Dkt. No. 238 at ¶92. To comply with Executive Directive #38, Green Bay created a Risk Management Site Plan (the "Plan"). Id. at ¶93. Per that Plan, Green Bay is required to investigate and handle issues in a timely manner. Id.

Complaints about potential environmental hazards are referred to Buildings & Grounds staff and decisions on how to address the issue fall within their discretion. Dkt. No. 238 at ¶94. If Buildings & Grounds staff believe that the issue is not able to be appropriately handled within the institution, then the institution would consult with the Bureau of Budgets and Facilities Management. Id. at ¶95. There is no policy or executive directive that explains specifically how staff is to respond to and address complaints regarding potential environmental issues. Dkt. No. 238 at ¶96.

10

## II. ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Federal Rule of Civil Procedure 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

11

B. Defendants' Sham Affidavit Argument

In their summary judgment reply brief, the State Defendants contend that the court should disregard the plaintiff's summary judgment declaration as a "sham affidavit." Dkt. No. 237 at 11. They state that "glaring inconsistencies" exist between the plaintiff's declaration submitted in opposition to their motion for summary judgment and his deposition testimony. The State Defendants cite to two inconsistencies, one related to whether the plaintiff orally complained about the fumes, and the other related to why the plaintiff did not mention the fumes or his symptoms at his early-February 2014 HSU appointments and/or did not submit an HSR to the HSU regarding his symptoms.

"It is well established in this Circuit that, as a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous statements[.]" Gates v. Caterpillar, Inc., 513 F.3d 680, 688 n.5 (7th Cir. 2008). In Yahnke v. Carlson, 613 N.W.2d 102, 106 (Wis. 2000), the Wisconsin Supreme Court adopted the federal "sham" affidavit rule: "[T]he ability to create trial issues by submitting affidavits in direct contradiction of deposition testimony reduces the effectiveness of summary judgment as a tool for separating the genuine factual disputes from the ones that are not, and undermines summary judgment's purpose of avoiding unnecessary trials." Id. Consequently, an affidavit that directly contradicts prior deposition testimony

12

is generally insufficient to create a genuine issue of fact for trial unless the contradiction is adequately explained. Id. If unexplained, the court disregards the offending part of the affidavit. See Gates, 513 F.3d at 688 n.5.

Regarding the first alleged inconsistency, the plaintiff's March 21, 2018, declaration states:

> 11. Between November 2013 and January of 2014, I spoke to cell hall staff, including Sergeant Laufenberg, about the fumes. I also spoke to Laufenberg about the fumes on several occasions and told him about the prison complaints. I understand that Laufenberg and Corrections Officer Zuge submitted work orders to GBCI maintenance asking that something be done to stop the fumes from entering the NCH.

Dkt. No. 240 at 12 (quoting Cox Decl., Dkt. No. 229 at ¶11). The State Defendants contend that the plaintiff's declaration squarely contradicts his March 21, 2018[4] deposition testimony:

> Q. Okay. So you drafted this complaint at the library. Before filing the Inmate Complaint or prior to this lunch conversation that you had, were you speaking with anybody else at the institution staff or fellow inmates about the fumes?
>
> A. No. Ledford he did all of the talking to the staff. He knows them all. I don't – That could be a dangerous situation. I don't do that.
>
> Q. Okay. So you are not talking to the staff?
>
> A. No.
>
> Q. You are only talking to the inmates?
>
> A. Yeah.

Dkt. No. 237 at 12.

---

[4] It appears that the plaintiff's declaration was signed on the same day that his deposition was taken.

The plaintiff and other inmates drafted the inmate complaint on February 19, 2014. Dkt. No. 238 at ¶¶12, 14. So the defendants are correct that in his declaration, the plaintiff said that he spoke to staff about the fumes "on several occasions" in the two months or so prior to drafting the complaint, while at his deposition he said that he spoke only to other inmates about the fumes. The court notes, however, that the proposed findings of fact focus on the plaintiff's *written* correspondence with prison staff. The question of whether the plaintiff orally notified staff about the fumes does not appear to be material to the question of whether the defendants had reason to know about the fumes.

Regarding the second alleged inconsistency, the State Defendants assert that in his declaration, the plaintiff avers that after being told both by a fellow inmate on February 13, 2014 and by an HSU nurse named Amanda on February 19 that there was no treatment available for the fumes symptoms, he "decided not to go to HSU for treatment." Dkt. No. 237 at 12-13. They say that the plaintiff also contended in his declaration that he "understood that, if [he] did go to the HSU, [he] would have to pay a co-pay only to be told that there was no treatment for [his] symptoms." Id. The State Defendants assert that the plaintiff "presents this excuse as his reason for not seeking treatment from HSU." Id. at 13. (It is not clear what the State Defendants mean by "this excuse"—the fact that someone told the plaintiff there was no treatment for fume exposure? Or the fact that the plaintiff didn't want to have to pay a co-pay?)

14

The State Defendants then argue that in his deposition testimony the plaintiff testified that his conversation with the other inmate about the inmate's HSU appointment and his conversation with Nurse Amanda were the reasons he did not bring up the fumes at his HSU appointment in early February 2014. Id. The defendants stated, "[The plaintiff] was then reminded that both of these conversations, by his own account, had actually occurred *after* his February 2014 appointments." Id. (emphasis in the original).

The plaintiff concedes that he did not bring up his fumes-related symptoms at his early February 2014 flu symptom-related HSU appointments. The plaintiff denies, however, that he has claimed that he did not bring up the fumes at these appointments based on the other inmate's experience. Dkt. No. 238 at ¶58. According to the plaintiff, he stated that, although the other inmate's experiences may have confirmed his belief that the HSU would not help, he did not specifically rely on these experiences in deciding not to report his symptoms from the fumes during his February 2014 HSU appointments. Id. The plaintiff also denies that he stated he did not bring up his fumes-related symptoms at his early February 2014 HSU appointments based on his conversation with Nurse Amanda. Id. ¶60. Rather, the plaintiff states that while he generally stated that he reported his symptoms to Nurse Amanda when she dispensed medication in February 2014 and that she informed him that HSU had no available treatment, he has not stated that his conversation with Nurse Amanda was a reason why he did not report his symptoms from the fumes at the February 2014 HSU appointments earlier in the month. Id.

15

The court credits the plaintiff's clarification of his testimony, but even if it didn't, the fact that the plaintiff did not bring up his fumes-related symptoms at his early February 2014 HSU appointments does not affect the court's ruling on the summary judgment motion. While a fact-finder may or may not find such information relevant to the plaintiff's credibility as to the severity of his symptoms, the court may not make credibility determinations, or weigh evidence, at the summary judgment stage. The court disagrees with the defendants that the plaintiff submitted a "sham" affidavit, and declines their suggestion that the court should not rely on the affidavit in deciding the summary judgment motion. The court has considered the plaintiff's affidavit, along with other evidence.

C.     Eighth Amendment Claim

The State Defendants contend that they did not violate the plaintiff's constitutional rights. Dkt. No. 207 at 9. According to the defendants, the fumes did not pose a substantial risk of serious harm to the plaintiff and any claim based the alleged cold is meritless because the plaintiff did not suffer an illness from exposure to the cold. Id. at 9, 13. They also contend that they did not act with deliberate indifference. Id. at 14.

The plaintiff asserts that the defendants violated his constitutional rights. Dkt. No. 224 at 15. According to the plaintiff, prolonged exposure to exhaust fumes containing carbon monoxide poses a substantial risk of serious harm. Id. The plaintiff states that lack of proper ventilation and exposure to air contaminants are sufficiently serious conditions that violate constitutional

16

rights; exposure to extreme cold is a sufficiently serious condition that violates

constitutional rights; a plaintiff's sworn affidavit is enough to raise a question

of material fact as to cognizable harm; and only cognizable harm, not a

diagnosable or treatable condition, is required to state a claim for deliberate

indifference to conditions of confinement. Id. at 15-22. The plaintiff also

contends that the defendants acted with deliberate indifference. Id. at 22.

Prison officials have a duty under the Eighth Amendment to provide

humane conditions of confinement, including adequate food, clothing, shelter,

and medical care. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994). Courts

evaluating claims of unconstitutional conditions of confinement must consider:

(1) whether the alleged deprivations were sufficiently serious to rise to the level

of a constitutional violation (the objective component), and (2) whether the

defendant prison officials acted with the requisite state of mind (the subjective

component). Wilson v. Seiter, 501 U.S. 294, 298 (1991).

> 1. *A Reasonable Factfinder Could Conclude that the Defendants
> Subjected the Plaintiff to Objectively Serious Deprivations*

To satisfy the objective prong of an Eighth Amendment claim, the

plaintiff must demonstrate "that, objectively, the deprivation he suffered was

sufficiently serious; that is, it must result in the denial of the minimal civilized

measure of life's necessities." Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011)

(internal quotation marks omitted). The necessities of life include "reasonably

adequate ventilation, sanitation, bedding, hygienic materials, and utilities."

Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016) (internal quotation marks

omitted). "[E]xtreme deprivations are required to make out a conditions-of-

confinement claim" because "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." Hudson v. McMillian, 501 U.S. 1, 9 (1992). "Some conditions . . . may establish an Eighth Amendment violation in combination when each alone would not do so . . . when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth, for example 'a low temperature at night combined with a failure to issue blankets.'" Gillis v. Litscher, 468 F.3d 488, 493 (7th Cir. 2006) (quoting Wilson 501 U.S. at 304).

Courts have held that exposure to "bad air" may constitute a serious deprivation. For example, in Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court affirmed a conclusion by the Eighth Circuit that a plaintiff's claim that he was exposed to second-hand smoke by being housed with a five-pack-a-day smoker was sufficient to allow him to proceed on an Eighth Amendment claim. The Tenth Circuit has assumed that exposure to "environmental tobacco smoke" is sufficient to satisfy the objective prong, based on the Helling decision. Graham v. Gunter, 9 F.3d 117 (table), *1 (10th Cir. 1993). The Eighth Circuit has recognized similar claims. See, e.g., Weaver v. Clarke, 45 F.3d 1253, 1254 (8th Cir. 1995); Sanders v. Brundage, 60 F.3d 484 (8th Cir. 1995). The Ninth Circuit has found that "[i]nadequate 'ventilation and air flow' violates the Eighth Amendment if it 'undermines the health of inmates and the sanitation of the penitentiary.'" Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996) (quoting Hoptowit v. Spellman, 753 F.2d 779, 784 (9th

Cir. 1985)). In <u>Board v. Farnham</u>, 394 F.3d 469, 486 (7th Cir. 2005), the Seventh Circuit described a jail's ventilation system that circulated black fiberglass dust into cells and caused numerous nosebleeds and respiratory problems for the plaintiffs and which exacerbated one plaintiff's asthma condition. The court determined that there "[was] no question that exposing prisoners to conditions such as those described by the [plaintiffs] 'is contrary to current standards of decency.'" <u>Id.</u>

The State Defendants "do not dispute that several times throughout the construction period, there was either a haze from the fumes and/or a smell from the fumes." Dkt. No. 207 at 10. They "do dispute, however, that there is any evidence to support [the plaintiff's] contention that the fumes were toxic or that he suffered adverse health consequences as a result of the fume exposure." <u>Id.</u> They assert that the plaintiff cannot prove that the fumes or the exhaust "posed an actual risk to his health because he has no evidence to substantiate his claim that the construction equipment—being operated out in the open air—emitted fumes that crept into the North Cell Wall through windows and cracks in an amount sufficient to rise to levels of a toxic concentration." <u>Id.</u> They assert that, without more, being exposed to exhaust or fumes does not pose a serious risk of harm. <u>Id.</u> at 10-11.

The plaintiff responds that "common sense and knowledge dictate" that exhaust fumes "contain harmful substances," that he has presented evidence that such fumes entered the North Cell Hall through the air intake valves and were spread around the hall, that the inmates were exposed to those fumes

and that they suffered breathing problems, nausea, burning eyes and other symptoms. Dkt. No. 224 at 10-11.

At this stage, it is not the court's role to weigh the evidence, and a reasonable jury could conclude that the plaintiff's evidence demonstrates that being exposed to the fumes "pos[ed] a substantial risk of serious harm" to the plaintiff. Haywood v. Hathaway, 842 F.3d 1026, 1031 (7th Cir. 2016) (quoting Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir. 2001)).

The plaintiff also argues that being exposed to extreme cold after prison staff turned off the heat and set up industrial fans constituted a substantial risk of serious harm. Dkt. No. 224 at 11-12. The defendants respond that the plaintiff cannot prove liability unless he can show that he suffered an illness as a result of the cold. Dkt. No. 207 at 13.

The Seventh Circuit has held that "extreme cold may violate the Eighth and Fourteenth Amendments." Jordan v. Milwaukee Cty., 680 Fed. App'x 479, 482 (7th Cir. 2017) (citing Haywood, 842 F.3d at 1030; Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997); Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013)). Even if an inmate had some alternative means of warmth, the court must consider whether the alternative "was adequate to combat the cold." Dixon, 114 F.3d at 643. Courts should consider the severity of the cold, its duration, whether the prisoner had alternative means to protect himself from the cold, the adequacy of such alternatives and whether he must endure other uncomfortable conditions as well as cold. Id. at 644. While the defendants argue that federal courts in other districts have found no liability without proof

20

that the inmate became ill from the cold, the Seventh Circuit has held that "[c]old temperatures need not imminently threaten inmates' health to violate the Eighth Amendment." Id. (citing Del Raine v. Williford, 32 F.3d 1024, 1035 (7th Cir. 1994)).

The defendants have not disputed the plaintiff's claim that in early February 2014—the height of Wisconsin winter, in a year where the average temperature was 10°F and the low for ambient temperature was -20°F[5]—the defendants turned off the heat and placed large floor fans on a tier of the North Cell Hall. See Haywood, 842 F.3d at 1030 ("Wind aggravates the effect of cold temperatures by increasing the speed at which heat is removed from exposed skin."). The plaintiff declares that these conditions persisted until the plaintiff's March 2014 transfer to segregation; while it is not clear exactly how long the plaintiff was subject to the fumes and the cold, it was at least weeks, and perhaps as much as a month. Dkt. No. 229 at ¶12 The plaintiff asserts that he and other inmates wore several layers of clothing "to try to tolerate the cold," and that some slept in their coats. Id. And the inmates suffered this condition while also being exposed to the exhaust fumes. "[T]he Supreme Court has recognized that some conditions, which taken singly do not constitute cruel or unusual punishment, may in cumulative effect violate the Eighth Amendment." Dixon, 114 F.3d at 643 (citing Wilson, 501 U.S. at 304).

---

[5] https://www.timeanddate.com/weather/usa/green-bay/historic? month= 2&year=2014

Under these circumstances, the court concludes that plaintiff has submitted evidence that would allow a reasonable jury could conclude that the cold "pos[ed] a substantial risk of serious harm" to the plaintiff.

Perhaps the defendants mean to argue that even if exposure to the fumes and the cold constituted objectively serious risks of harm to the plaintiff, he could not prevail because he has not presented evidence that he suffered cognizable harm from these conditions. A plaintiff "must do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from the [combination of conditions] . . . ." Gray, 826 F.3d at 1006 (citing Carey v. Piphus, 435 U.S. 247, 264 (1978)).

> When assessing an Eighth Amendment claim, [courts] look for physical injury "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Hayes v. Snyder, 546 F.3d 516, 523 (7th Cir. 2008). [The plaintiff] contends that his asthma became worse as a result of the unsanitary conditions at Stateville, and that he also began suffering from skin breakouts within six to eight months of his arrival there. (Bearing in mind that this is a prison-conditions case, not a case about inadequate medical treatment, this is enough to show some physical injury. Excessive cold, for example, can also amount to an Eighth Amendment violation, even if the prisoner has not yet come down with the flu.)

Id. "[A]n affidavit is evidence for purposes of determining whether a genuine issue of material fact exists." Jackson v. Duckworth, 955 F.2d 21 (7th Cir. 1992) (citing Fed. R. Civ. P. 56(c)).

The plaintiff has submitted an affidavit declaring the following:

22

> Because of long-term, daily exposure to carbon monoxide
> fumes, other prisoners and I became physically ill. Specifically, I had
> severe headaches on a daily basis and vomited at least four times. I
> sometimes missed meals due to nausea, and on several occasions, I
> became extremely dizzy. My eyes would also feel like they were
> burning or stinging, and I sometimes had trouble breathing. During
> this time, I could also hear other prisoners vomiting in their cells.

Dkt. No. 229 at ¶7. As to the temperature, the plaintiff says that he saw other

prisoners wearing sweatshirts, sweatpants, hats, coats and blankets

"constantly," and that he "did the same to try to tolerate the cold while still

experiencing symptoms from the ongoing fumes." Id. at ¶12.

These allegations are sufficient to demonstrate some physical injury.

Because a reasonable factfinder could conclude that the plaintiff was subjected

to a serious risk of harm and that he suffered injury as a result, the court

turns to the subjective prong of the Eighth Amendment claim.

> 2. *A Reasonable Factfinder Could Not Conclude that the
> Defendants Acted with Deliberate Indifference*

To show deliberate indifference in an Eighth Amendment conditions-of-

confinement case, the plaintiff must identify evidence indicating that the

defendants knew about the condition but refused to take reasonable steps to

resolve it. See Gray, 826 F.3d at 1008 ("The warden must have known of and

disregarded an excessive risk to inmate health or safety.") (internal quotation

marks and brackets omitted). "[I]t is not enough for the inmate to show that the

official acted negligently or that he or she should have known about the risk."

Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008) (citing Pierson v.

Hartley, 391 F.3d 898, 902 (7th Cir. 2004); Haley v. Gross, 86 F.3d 630, 641

(7th Cir. 1996)). The plaintiff must show that the official "received information

23

from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference." Id. (citing Pierson, 391 F.3d at 902; Proffitt v. Ridgeway, 279 F.3d 503, 506 (7th Cir. 2002)). However, the plaintiff need not prove that the defendants "acted or failed to act believing that harm actually would befall" the plaintiff; it is enough to show that the defendants "acted or failed to act despite [their] knowledge of a substantial risk." Gray, 826 F.3d at 1008 (quoting Farmer, 511 U.S. at 842). Evidence that the defendants "must have known" about the conditions is sufficient for a jury to find deliberate indifference. Id.

The defendants contend that they did not act with deliberate indifference because they did not subjectively draw the inference that there was an actual risk and because each defendant, even without drawing an inference, nonetheless acted in response to the possibility of a risk. Dkt. No. 207 at 14. The plaintiff contends that the defendants acted with deliberate indifference when they failed to effectively mitigate the exhaust fumes. Dkt. No. 224 at 22. According to the plaintiff, the defendants failed to monitor a known hazard and failed to take additional steps when made aware of an ongoing problem. Id. at 22-27.

a.    Information available to officials

i.    **November 2013-January 2014**

The plaintiff asserts that between November 2013 and January 2014, he talked to staff members in the North Cell Hall about the fumes, and about the fact that prisoners were complaining. Dkt. No. 229 at ¶11. (The court

24

understands that the defendants believe this statement conflicts with the plaintiff's deposition testimony.) The record includes an affidavit from inmate Paul Bonner, who attests that the fumes were causing him and other prisoners to suffer health problems, and that he "complaint to [his] cellhall supervisors, but they said there was nothing they could do." Dkt. No. 221 at 10-11. While Bonner attests that the "fumes continued daily for several weeks, and they continued to cause the above physical problems on a nearly daily work basis," he does not provide a specific time frame. Id. at 10. The materials also contain an affidavit from inmate Derrick Jones, who said that that in January 2013, he'd become "violently ill" and vomited while talked to a Sgt. Francois about the exhaust fumes. Dkt. No. 221 at 12. The court assumes that Jones meant January 2014, given that the construction project did not start until the fall of 2013. Jones implies that he made more than complaint about the fumes. Id.

Todd Zuge was a corrections officer assigned to the North Cell Hall between 2013 and 2014. Dkt. No. 231, transcript p. 13 at lines 11-14. He walked the cell hall three to four times a week. Id., transcript p. 14 at lines 6-13. He noticed fumes in the North Cell Hall during that time, but testified that he couldn't recall when he first noticed them. Id., transcript p. 38 at lines 22-25 to p. 39 at lines 1-2. He noticed the fumes "occasionally," "early on in the project." Id., transcript p. 39 at lines 3-7. He described the fumes as "like a diesel fume," and said that it was "[n]oticeable but not overpowering." Id. at lines 16-18. Zuge didn't like the fumes, but said that he wasn't concerned about them. Id. at lines 21-23. He testified that he never experienced

25

symptoms—headaches—from the fumes. Id., transcript p. 40 at lines 3-8. Zuge said that there were two fans "located in the secure workstation" that he "had on." Id. at lines 12-15. He testified, however, that he didn't run the fans because of the fumes; they were "just for an airflow kind of thing" and were "always running." Id., transcript p. 68 at lines 3-4. He said he would have addressed the issue of the fumes to Sgt. Laufenberg, perhaps a couple of times. Id., transcript p. 41, lines 1-15. Zuge also testified that both staff and inmates asked him whether he noticed the fumes or dust. Id. at lines 19-25 to p. 42 at lines 1-6. He thought inmates talked to him some six to ten times about the fumes. Id., transcript p. 42 at lines 20-22. He told the inmates that "it was being addressed with the sergeant." Id., transcript p. 43 at lines 2-3. Zuge said that he didn't notice any inmates having symptoms from the fumes. Id. at lines 6-9.

Zuge testified that it got cold on the North Cell Hall in the winter, and that he addressed it by wearing a light jacket. Id., transcript p. 44 at lines 6-13. He noticed prisoners wearing an extra shirt. Id. at lines 17-19. He said he did not think the fumes were a recurring problem. Id., transcript p. 45 at lines 13-14.

Sgt. Laufenberg testified at his deposition that he first noticed fumes in the North Cell Hall in January or February of 2014. Dkt. No. 232, transcript p. 46 at lines 11-13. He described them as "diesel exhaust." Id. at lines 15-17. He said that he "worked through" the fumes, and that they "didn't hurt [his] eyes or anything." Id. at lines 20-22. He said that he took no action to protect

26

himself from the fumes. Id., transcript p. 47 at lines 1-7. Nor did he do anything to protect the prisoners. Id. at lines 8-11. He recalled making complaints to his direct supervisors about the fumes, in response to inmate complaints. Id., transcript p. 48, lines 1-9. He would tell his supervisors "[t]hat it smelled like fumes, smoke, dust, whatever it was." Id. at lines 15-16. He spoke about the fumes to his supervisors, captains, lieutenants "who would come down and ask [him] about [the fumes]," a complaint examiner, and co-workers, including Zuge. Id., transcript p. 50 at lines 4-25. He described the conversations with his co-workers as "just bitching to each other about [the fumes]." Id. at lines 21-22.

Laufenberg also recalled talking to prisoners about the fumes, recalling that "[g]enerally they were making complaints about [the fumes], too." Id., transcript p. 51 at lines 1-8. He did not recall any prisoner mentioning any specific symptoms. Id. at lines 12-15. Both Laufenberg's co-workers and the prisoners would complain "whenever they were working out there with the—and the fumes were coming in, they would complain." Id. at lines 18-20. He said that "[w]henever it got bad, [the inmates] would complain." Id. at lines 24-25.

As to temperature, Laufenberg testified that he didn't recall anything particular about it getting very cold in the 2013-2014 period. Id., transcript p. 53 at lines 11-16. He testified that if the temperature was "on a warmer setting and we have a cold snap, yeah, it can get cold in there." Id. at lines 19-20. He said that he did not wear additional layers in these conditions, but that some

27

other guards wore polar fleece pullovers or hoodies. Id., transcript p. 54 at lines 1-9. Prisoners would "wrap up in their blankets." Id. at lines 19-20. He did not recall more inmates than ordinary complaining about the cold in 2013-14. Id., transcript p. 55 at lines 2-5.

### ii. **February 2014**

The defendants do not dispute that on February 6, 2014, the plaintiff completed an interview/information request form to the Maintenance Department, complaining that "[a] lot of inmates" were experiencing health problems due to the "engine combustion fumes coming into the cell hall from the construction work going on right outside the cell hall," and asking whether maintenance was doing anything about it. Dkt. No. 238 at ¶9. Nor do they dispute that the "staff-response section on the request form was empty." Id.

On February 12, 2014, inmate Ledford submitted an offender complaint complaining that fumes from the machinery and the tolls was being "sucked into the cell hall, some days it is so bad that there is a smoke-like, smoggy haze. Dkt. No. 227-6 at 2. Ledford reported that he and other inmates were experiencing headaches, dizziness, nausea, vomiting, breathing problems, sore throats and burning, stinging eyes. Id. Ledford said that he'd spoken to a sergeant on the cell hall who'd responded that the issue was "beyond his control." Id. Ledford complained that the solution appeared to be to turn off the heat and to concurrently run floor fans, making it colder and spreading the fumes around. Id. He said that he'd sent a complaint resolution letter to Pusich, the security supervisor, on February 4, 2014, but had not received a

28

response. Id. Ledford also reported that on February 5, he'd spoken to a captain about the problem, but hat the captain knew of the issue but "didn't see what could be done." Id. at 3. Finally, he said that on February 11, he'd spoken to Laufenburg and Zuge who said that they had complained and had written work orders about the problem, "even having spoken to the Health and Safety Officer who didn't appear to take it seriously." Id. Ledford suggested that flexible tubes or pipes could be put over the air intakes/exchanges and connected to the rooftop, to keep the fumes from getting into the cell halls. Id. The complaint examiner's office assigned this complaint #GBCI-2014-3543. Id.

The record contains a memo from Ledford to Pusich, dated February 4, 2014. Dkt. No. 227-6. There is no "received" stamp on the memo and no indication of whether it was received, when it was received or who may have received it.

On February 12, the plaintiff submitted his request to the HSU, complaining of the symptoms he'd experienced as a result of the construction project; the HSU staff stamped it "received" on February 13, 2014. Dkt. No. 229-1 at 2. This request explicitly stated that the plaintiff's symptoms—nausea, vomiting, dizziness, blurred vision, headaches—were [d]ue to the construction project going on outside the NCH." Id. (Whoever wrote the HSU response did not seem to be aware of the construction project, stating "[n]ot sure what your referring to regarding construction . . . ." Id.)

The complaint examiner's office marked Ledford's complaint "received" on February 14, 2014. Dkt. No. 227-6 at 2.

On February 16, 2014, the plaintiff wrote the "Memorandum" to Pusich, the security supervisor. Dkt. No. 227-8 at 5. He explained that the exhaust fumes from the construction machinery were leaking "heavily" into the cell hall through cracks in the window frames, and were causing him and other inmates health issues. Id. He explained that he'd written to the maintenance department, but had not received a response. He told Pusich that the only solution to the problem had been "to run the large floor fans," but that this had done nothing that "circulate the fumes around even more." Id. He also explained that the heating system was off, which wasn't a solution because of the "sub freezing temps outside." Id. He asked that staff devise a solution immediately and indicated that the memo constituted a "formal complaint resolution attempt letter." Id. at 6.

Pusich testified at her deposition that she'd noticed the fumes in North Cell Hall between 2013 and 2014. Dkt. No. 212, transcript p. 51 at lines 10-12. She didn't recall when she first smelled them but testified that "any particular notice of the fumes came from an inmate addressing this issue." Id., transcript p. 52 at lines 11-13. She didn't recall which inmate notified her of the fumes. Id. at lines 14-15. She testified that in response to any inmate interview request she got about the fumes, she "spoke with Ms. Basten, she was the correction services manager." Id., transcript p. 55 at lines 16-20. Regarding the plaintiff's February 16, 2014 "memorandum," however, Pusich testified that she did not recall seeing it between 2013 and 2014. Id., transcript p. 71 at lines 2-4. The February 16, 2014 memorandum bears a stamped "RECEIVED

30

FEB [illegible—18?] 2014." Dkt. No. 227-8 at 5. Pusich testified that she never marked her correspondence. Dkt. No. 212, transcript p. 71 at lines 23-24. She testified, however, that one "potential explanation" for the stamp "is if I got this letter and I forwarded it to Ms. Basten's office, her office stamps receive letters as many other offices do . . . ." Id., transcript p. 72 at lines 3-6. Pusich emphasized that she wasn't saying that that was what happened; she was speculating. Id. at lines 7-9. She indicated that she did not recall responding to the memo. Id. at lines 10-12. She thinks she must have forwarded it "to somebody." Id. at lines 15-16.

At her deposition, Basten testified that she was notified by a captain that a couple of officers were complaining about fumes in the cell hall. Dkt. No. 214, transcript p. 25 at lines 23-25. She testified that she met with building and grounds superintendent Chris Timmers and "had a discussion as to what, you know, if he was reviewing it, what he had done." Id., transcript p. 26 at lines 1-4. Basten testified that Timmers had "said what they were doing to mitigate it is they were turning off the two air handlers on that side of the building to prevent fumes from coming inside the institution." Id. at lines 21-24. Timmers also apparently indicated that the cell hall was being painted at the same time. Id. at lines 24-25 to transcript p. 27 at lines 1-3. Basten testified that she recommended that, with the air handlers off, there should be no painting. Id., transcript p. 27 at lines 3-9. She testified that Timmers made the decision to turn off the air handlers. Id. at lines 12-14. She also testified that "[t]hey had some fans going in the cell halls to still keep the airflow moving but to keep the

31

fumes out, they closed off the air handlers just during the construction time so then once the construction was done, they would turn it-you know, hour or two after construction was done, they'd turn them back on." Id., transcript p. 28 at lines 6-14. Basten said she brought the issue "to the attention in the next meeting so the contractors were aware of it, which is just I would say it was within a week, I'm not sure . . . ." Id., transcript p. 26 at lines 5-8.

As to temperature, Basten testified that Timmers monitored the temperature daily. Id., transcript p. 31 at lines 23-25 to transcript p. 32 at lines 1-3. She didn't recall discussing the temperature of the North Cell Hall with Timmers, id., transcript p. 32 at lines 12-15, but said that it was usually between 68 and 70 degrees in the cell hall, id at lines 19-21. She testified that she was not aware that when the air handling units were shut off, the heat was shut off. Id., transcript p. 35 at lines 16-19.

The same day that the plaintiff wrote to Pusich—February 16, 2014—he sent a complaint letter to the Appleton Area Office of the Occupational Safety and Health Administration. Dkt. No. 229 at ¶21.

At 9:00 a.m. on February 18, 2014, a construction meeting took place—the one Basten referenced in her deposition. Dkt. No. 220-1 at 2. Among those present at the meeting were Basten, Timmers and DOC chief engineer Randall Mattison. Id. at 4. At this meeting, Basten reported that she had received a letter from the Occupational Health and Safety Administration; "[a]n inmate had filed a complaint regarding exhaust fumes which came through the air handler units." Id. at 3. The meeting notes indicated, "GBCI will send a copy of

32

the OSHA letter to Randy [presumably engineer Randall Mattison] and he will take appropriate measures to reduce the fumes." Id.

The same day—February 18, 2014—the plaintiff drafted his group inmate complaint in which he reiterated that the purported "fixes" were "not working." Dkt. No. 227-8 at 2. According to the complaint log listing all the plaintiff's inmate complaints, this is the only complaint he submitted about the fumes. Dkt. No. 210-1. Six other inmates signed it, including Ledford. Dkt. on. 227-8 at 3. It is hard to tell whether the "RECEIVED" date reads February 18 or February 19, but the complaint was assigned file number GBCI2014-3613. Id. It appears that the complaint examiner's office received it on February 18, 2014, because complaint examiner Martin reviewed the complaint, and discussed in his summary of facts the actions he'd taken on that date. Id. at 22-23.

Martin reported that on February 18, 2014, he'd contacted two corrections officers, Laufenberg and Zuge, who told Martin that they'd been aware "of the problem existing since the start of the construction project, and basically corroborated a previously-submitted inmate complaint . . . ." Id. at 22. According to Martin, Laufenberg and Zuge confirmed "notifying the Health and Safety Officer [Leurquin], and writing/submitting the appropriate work orders." Id. Martin said that Zuge indicated that "the practice of shutting down the air exchange units did not take place until after there were multiple occurrences of the problem, but could not confirm whether the attempts to mitigate matters were in response to the work orders." Id.

33

Martin reported that he also talked with Health and Safety Officer Leurquin on February 18. Id. Leurqin told Martin that he could not recall anyone "formally telling him about the situation," but that inmate Ledford may "have told him something to the effect in passing." Id.

Martin also recounted that at about 10:00 a.m. on February 18, he was walking through the North Cell Hall when an inmate (not one of the ones who signed the group complaint) told him that while the "situation" was improving, there were still days where the presence of the fumes was very strong. Id. at 23. This inmate complained of sinus problems, complained that shutting down the air exchange units required inmates to wear coats and get under blankets and complained that "fans only worked to make the NCH colder." Id.

In his affidavit, inmate Paul Bonner attests that on February 18, 2014, he and another inmate, William Ledford, talked to Laufenburg and Zuge about the institution management's frustration with the fact that Ledford had "filed formal complaints" about the fumes, and about the fact that Laufenburg and Zuge had "confirmed and supported the allegations of the complaints." Dkt. No. 221 at 10. He says that a few minutes later, he saw Ledford with examiner Martin, and that there were fumes present while Martin was there. Id. He says that he and other inmates told Martin what it had been like in the hall, and that Martin acknowledged "that it was definitely a problem and should have been resolved before construction began and that there should not be any fumes in the cellhall." Id. at 11. Inmate Derrick Jones attested that he, too, talked to Martin about the fumes on February 18, and that Martin

34

acknowledged the problem and said that he "wanted it stopped immediately."
Id. at 12-13.

Martin reported that about an hour later, Zuge contacted him, reporting that "the odor of exhaust was again present in the NCG." Dkt. No. 227-8 at 23. Martin said that he immediately went to the security office and contacted someone named Kathy Pasch, who let him into a room where he could view the entire construction project, including the "fuel-powered machinery operating." Id. He then went to the North Cell Hall, "noting a detectable presence of an odor in the air upon exiting the Security Suite (2nd floor)." Id. Martin wrote that when he entered the North Cell Hall, "the odor's presence was even stronger (and there existed a noticeable haze in the air when looking at the north end of the NCH), and yet even stronger when past the mid-point firewall along the Alpha cells." Id. At that point, Martin stated, he "became convinced that it was indeed the odor of exhaust fumes and not the paint that had been applied and was being applied to the NCH walls by inmates." Id. Martin indicated that he then was contacted by inmate Ledford and other inmates, "each of whom was complaining about the odor and its effects on them." Id. One inmate (not one of the ones who signed the group complaint) reported having vomited "during one of these periods." Id.

The next day—February 19, 2014—the plaintiff says that he ran into a nurse named "Amanda," who was handing out daily medications. Dkt. No. 229 at ¶18. The plaintiff says that he told Amanda that he was "having severe headaches, vomiting, loss of breath, blurred vision, and nausea because of the

35

fumes." Id. Amanda examined the plaintiff and told him "that about seven or eight prisoners were complaining to the HSU because of the same symptoms each day." Id. The plaintiff says, however, that "all of the prisoners were told that the HSU did not have any treatment for these symptoms."[6] Id.

At the deposition of health and safety officer Leurquin, counsel asked if Leurquin remembered "speaking to William Ledford about fumes—about fumes in 2013, 2014[.]" Dkt. No. 216, transcript p. 8 at lines 7-9. Leurquin responded that he remembered Ledford coming up to him and saying that that there were exhaust fumes in the cell; Leurquin said that he that he responded, "okay," then went about his business. Id. at lines 13-18. He testified that "[t]wo minutes before Ledford" brought the fumes to his attention, Officer Zuge had done so. Id. at lines 22-23. Leurquin testified that Zuge "said there is exhaust fumes in the cell." Id. at lines 24-25 to transcript p. 9 at line 1. Leurquin responded that he'd bring the matter to his boss's attention, and that he later told Chris Timmers that Leurquin "had a couple complaints of exhaust fumes in the cell." Id., transcript page 9 at lines 2-14. According to Leurquin, Timmers followed up with him—Leurquin was not sure how much later— saying that Timmers "performed an air quality control test and everything came out fine." Id., transcript page 10 at lines 3-7.

Leurquin also testified that in his role as a member of the Health and Safety Committee, "once a month, we tour a part of the institution and we look

---

[6] The defendants have urged the court to reject this assertion, stating that it is hearsay, and that it is part of the defendant's "sham" affidavit. Dkt. No. 239 at ¶18.

for immediate health and safety issues." Id., transcript p. 14 at lines 2-5. While he did not explain who he meant by "we," the context implies that "we" was the Health and Safety Committee. Leurquin testified that because of the reports from inmate Ledford and Officer Zuge about fumes, "we made a walk-through and not one person on the Committee smelled any exhaust or observed anything that was an immediate health and safety issue." Id. at lines 21-24. While he remembered that the walk-through took place in the morning, Leurquin could not remember the day, or whether there was construction going on at the time. Id., transcript page 15 at lines 2-18.

The inmate complaint examiner's office acknowledged receipt of the group complaint on February 19, 2014—the day after Martin began investigating. Dkt. No. 228-19.

Included in the defendants' submissions is a letter from an inmate named Ryan Mueller, which Mueller dated February 14 (no year). Dkt. No. 221 at 6. There is a stamp on the letter that says "RECEIVED FEB 19 2014"—the day after the construction meeting, the group complaint and the commencement of Martin's investigation. The letter is a bit disjointed, and it isn't addressed to any particular person or department. But it says that Ryan is asking for "an immediate solution by GBCI or contractors to deal with serious health and safety issues other than turning off fan, heat/air exchanges during these cold months or using floor fans." Id.

On February 20, 2014—two days after the plaintiff wrote the group complaint and Martin started investigating—Mattison, the agency engineer for

37

the DOC, wrote a memorandum regarding a "review" that had been "conducted" of the North Cell Hall ventilation system "at the request of GBCI management as part of the investigation process for response to an inmate complaint dated February 11, 2014, regarding fumes from construction equipment." Dkt. No. 229-5 at 3. The memo was addressed to Basten, the corrections services manager. Id. It was copied to Timmers, the buildings and grounds superintendent. Id. at 4. It appears that the review was conducted in response to Ledford's inmate complaint.

Mattison reported that he'd talked with "GBCI maintenance staff and contractor management working in the area immediately east of the North Cell Hall in the month prior to the date of the complaint," and had learned that the construction work involved "diesel fueled equipment, such as excavator and crane." Id. Mattison learned that "[w]hen equipment was operating in the area adjacent to the east wall of the cell hall near an air intake, GBCI maintenance staff would shut down that particular air intake." Id.

Mattison also said that "[t]hrough GBCI management, a review of Health Service Unit logs, within the limitations of HIPAA, was requested for the month prior to the date of the complaint looking for any instances where any inmates had been in the unit complaining of nausea or vomiting due to fumes in their cell hall." Id. He indicated that "[t]he nurse" told him that "there were no instances of visits with those types of medical complaints in that time period." Id.

Mattison concluded that it was "possible that diesel exhaust fumes may have entered the North Cell Hall during construction activity." Id. He stated, however, that "[w]ith the volume of outside air flow in relation to the amount of exhaust that would have been present, it is not expected that dangerous concentrations of fumes or combustion by-products would have been present." Id. He also stated that the construction had reached the point "that further issues from diesel exhaust are not expected." Id. He indicated that the contractors had "agreed that any further use of equipment in the area of the air intakes will utilize exhaust scrubbers to mitigate the effects of the exhaust." Id. He noted a "remaining potential area of fume creation"—the "adhesives that will be used with the roofing materials for the new building." Id. As to that potential, he reported that "[t]he contractors have agreed to work with GBCI staff to secure air intakes near the work areas when that work is to be done." Id. He concluded "that ventilation systems have operated as designed and no lasting health effects have occurred," and recommended "no further action beyond that described above." Id.

The defendants do not dispute that Mattison had no medical training and was not qualified to make medical diagnoses. Dkt. No. 239 at ¶39. The plaintiff asserts that he looked at the North Cell Hall equipment for only forty-five minutes and reviewed the blueprints of the ventilation system for only a couple of hours; while the defendants object that these assertions are argumentative and that there is no evidence Mattison's actions did not conform to industry standards, they do not dispute the facts themselves. Id. at ¶40.

39

The same day—February 20, 2014—the Appleton area office of OSHA received the plaintiff's letter of complaint. Dkt. No. 229-2 at 2. It responded the same day, advising the plaintiff that OSHA didn't cover public employees or inmates in a state correctional facility, and suggesting that he contact the Department of Corrections. Id.

Complaint examiner Martin received Mattison's report on February 24, 2014. Dkt. No. 227-8 at 23. After reviewing Mattison's conclusion that the ventilation systems had worked as designed and that there had been no lasting health effects, Martin stated, "With all due respect to [Mattison], these conclusions are not the issue in the complaint submitted by [the plaintiff], although it is clear that the report was written in response to the complaint, with various references to it." Id. He observed that Mattison's report conceded that "diesel exhaust may have leaked into the building," and that Mattison had spoken only "with the construction personnel, and not with inmates or GBCI staff other than maintenance and/or construction." Id. at 24. Martin opined that Mattison's statement that because there were no inmate medical requests during construction there were no lasting health effects "strains credulity." Id. Martin noted that an inmate could have symptoms without reporting them to HSU, particularly if the inmate didn't want to incur a co-pay, or if the inmate didn't trust the HSU. Id. He pointed out that Mattison was not a medical professional and could not see into the future. Id.

On February 25, 2014, the complaint examiner's office received a complaint drafted by an inmate named Michael Piester. Dkt. No. 228-20 at 4.

40

Piester dated the complaint February 11, 2014. Id. at 2. He indicated that he had contacted Pusich that same day—February 11—but that fumes were still coming in. Id. He also indicated that that day he had addressed the "cell hall sergeants" about a lack of heat, and they told him to contact Pusich. Id. at 3. Piester said he contacted Pusich, and received no reply. Id. Martin rejected the complaint on February 28, 2014, stating, "[t]his issue was previously addressed in complaint #GBCI-2014-3534," id., which was Ledford's February 12, 2014 complaint, received by the complaint examiner's office on February 14.

The same day—February 25, 2014—the complaint examiner's office received a complaint from inmate Sean Stankowski. Dkt. No. 228-21 at 4. Stankowski signed the complaint on February 24, 2014. Id. He complained about the fumes, indicating that the problem started on February 21, 2014 and was "ongoing," and said that he'd written to Pusich and others with no success. Id. at 2. He also complained about the heaters being turned off, the floor fans and the cold. Id. Martin rejected this complaint on February 28, 2014, again on the basis that "[t]his issue was previously address in complaint #GBCI-2014-3534." Id. at 5.

On February 26, 2014, Martin rejected the group complaint from the plaintiff, Ledford and others, on the same grounds as the rejection of the complaints from Piester and Stankowski—"[t]he issue in this complaint was previously addressed in Complaint #GBCI-2014-3543." Dkt. No. 228-19 at 19.

On February 27, 2014, Basten sent, via email, Mattison's report to various people, including Pusich. Dkt. No. 228-24 at 2. She wrote, "I'm sharing the memo regarding steps that have been taken to prevent fumes in the NCH. I think at this time it would be prudent to stop painting in the cell hall until windows can be opened and the air handlers don't have to be shut down due to construction." Id.

### iii.    **March 2014**

On March 2, 2014, the plaintiff prepared a request for review of the rejection of the group complaint. Dkt. No. 228-19 at 9. While the court can't make out the date on the "RECEIVED" stamp, the complaint examiner's office documented receiving an "appeal" on March 4, 2014. Id. at 20

Inmate Bonner's affidavit is dated March 8, 2014, and it reported that "[d]uring the last three weeks, even on those days where the temperatures and windchill were subzero, because of the complaints, rather than resolve the fumes at issue at the source, prison officials shut off the heat and air intakes which caused the cellhall to become uncomfortably cold." Dkt. No 221 at 11. Bonner stated that "[o]n one occasion the [he]at and air intakes were off for nearly 24 hours." Id. The record does not indicate whether Bonner complained to anyone about the cold in the three weeks prior to March 8, 2014.

On March 14, 2014, defendant Baenen, the warden at Green Bay issued a decision on the plaintiff's request for review of the group complaint. Dkt. No. 228-19 at 21. He stated, "This complaint was inappropriately rejected by the ICE. It has been returned to the ICE for further investigation." Id.

42

Martin indicated that on March 14, 2014, he contacted the plaintiff, Bonner and two other inmates. Dkt. No. 227-8 at 23. The plaintiff complained to Martin of nausea, headaches and burning throat and eyes "during the incident in question." Id. Bonner complained of "nausea, dizziness, and extreme headaches." Id. The other two inmates complained of nausea and eye irritation, or a "vertigo-type feeling of dizziness, and general aches and pains." Id. All four "stated that HSU told them in varying degrees that there was nothing that HSU could do without an HSR and resulting co-pay." Id.

Martin signed his report the same day—March 14, 2014. He concluded that "[t]he sole issue in this complaint is whether there has been a noticeable amount of exhaust gas and fumes entering into the building when the gas-powered machinery is being operated outside of the [North Cell Hall], before and after the 'fixes' described by all parties had been implemented. The clear answer is yes." Id. at 24. Consequently, Martin recommended that the group complaint be "affirmed." Id.

On March 17, 2018, warden Baenen issued another decision, indicating that he was dismissing the group complaint "with modification." Dkt. No. 228-19 at 25. He wrote, "This issue has been reviewed by the project engineer, and the construction expert in charge of the project concluded that there was no harmful emission or action intended to harm anyone." Id.

The plaintiff was transferred to administrative segregation on March 23, 2014. Dkt. No. 229 at ¶36.

Basten testified at her deposition that she did not agree with Martin's conclusion, in part because of the "fixes we did in monitoring the cell hall that, you know, the [buildings and grounds] Superintendent [Timmers] was good in monitoring," in part because "[t]he answer I received from our DOC engineer [Mattison] complaint, you know, there was fumes—there was—but there was no—there was never any health complaint filed by any of these inmates." Dkt. No. 214, transcript p. 48 at lines 10-19. Basten was the person who had checked with the HSU, at Mattison's request, to see if any inmates had filed "any medical requests for headaches or any complaints like that," and determined that HSU "didn't have any complaints that they knew of that anybody referenced to the fumes in the cell hall." Id., transcript p. 36 at lines 6-13.

Pusich testified that in response to the complaint from Michael Piester, she indicated "that it was determined that the fumes do not present a health risk." Dkt. No. 212, transcript p. 67 at lines 11-24. When asked what she based that statement on, Pusich responded, "I venture to guess to say it was based on Ms. Basten's memo." Id., transcript p. 68 at lines 2-3. When asked who decided that the fumes did not present a health risk, Pusich responded,

> I would want to reference that memo to see whom exactly it came from. It was forwarded to me by Ms. Basten. In fact, any information related to this matter was communicated to me by Ms. Basten so I don't know who made the determination however.

Id. at lines 8-13.

Warden Baenen testified at his deposition that he thought he first heard about fumes in the North Cell Hall sometime in February 2014, though he

44

wasn't sure. Dkt. No. 213, transcript p. 44 at lines 6-10. He recalled talking with Basten about the fumes issue, with complaint examiner Martin and with some staff members; he also recalled getting some letter complaints from inmates. Id. at lines 13-18. He thought Basten told him that she was going to consult with Timmers and Mattison and look into the matter. Id. at lines 21-25. He said he asked Basten for progress on what she'd heard (more than once). Id., transcript p. 45 at lines 2-17. Regarding Martin, Baenen recalled that some inmates had filed complaints that Martin had rejected, and Baenen felt it was "important to get them on the record." Id. at lines 18-25. Baenen said that one particular inmate's concerns hadn't been addressed, so Baenen sent the complaints back to Martin to investigate. Id., transcript p. 46 at lines 1-6. After Martin provided the results of his investigation, Baenen talked with Martin about Martin's analysis, reviewed Martin's reports then "made [his] decision and then talked to [Martin] about his recommendation for affirming and [Baenen's] recommendation for dismissing some of those complaints." Id. at lines 8-14. Baenen said that by the time Martin recommended affirming the complaints, "we had done some things to address the issues that the inmates raised, you know." Id., transcript p. 47 at lines 13-20. Baenen testified that "we" had had Mattison investigate, and that Mattison had "talked about making some changes and how the ventilation system was operating when the diesel fumes or when the—I think it was the generator that was generating the fumes the inmates were complaining about was operating." Id. at lines 21-25 to transcript p. 48 at lines 1-5. Baenen said he also asked Basten whether

45

Mattison's recommendations were being followed. Id., transcript p. 48 at lines 11-12. He recalled that Basten said something along the lines of "yes, the ventilation system functioning had been operating as [Mattison] recommended." Id. at lines 15-18. Baenen recalled that Martin stood by his recommendation to affirm the inmate complaints. Id., transcript p. 49 at lines 23-25. Baenen recalled Zuge telling him about fumes. Id., transcript p. 50 at lines 22-24 to p. 51 at lines 1-4. Baenen never spoke to Mattison directly about the fumes. Id., transcript page 52 at line 24.

On March 17, 2014, Baenen dismissed the group inmate complaint with modification. Dkt. No. 213-1 at 8. In the "Reason(s) for Decision" section, he stated, "This issue has been reviewed by the project engineer, and the construction expert in charge of the project concluded that there was no harmful emission or action intended to harm anyone." Id. At his deposition, Baenen said that he dismissed the complaint with modification because he was "addressing the bigger issue of beyond were there fumes in the cell hall and the institution had taken steps to have it looked into and taken steps to try to alleviate the situation." Dkt. No. 213, transcript page 72 at lines 21-25. He testified that he "could have affirmed [the complaint] had [he] focused merely on the existence of the fumes." Id. at line 25 to transcript p. 73 at line 1. He said that he made his determination by relying on the reports from Basten that steps were being taken to deal with the fumes, and from Mattison's report as conveyed to him by Basten. Id., transcript p. 73 at lines 5-19. He didn't recall what he'd relied on to conclude that there was no evidence of harm. Id. at lines

46

21-25 to transcript p. 74 at line 4. Baenen testified that to deal with the fumes, he "talked with Ms. Basten and told her to make sure that we followed the procedures that Mr. Mattison recommended in terms of ventilation and to be aware of the issue for the future." Id., transcript p. 75 at lines 7-11.

        b.      What the defendants did

The evidence indicates that inmates were complaining of fumes and cold between November 2013 and January 2014. It also indicates that Zuge and Laufenberg were aware of the fumes and the cold during that time, although they testified that they weren't worried about either. The evidence indicates that Laufenberg told supervisors and other staff, but there is no evidence who those supervisors or staff members were. The plaintiff wrote a memo to the maintenance department on February 6, 2014, but the evidence does not indicate whether anyone in the maintenance department received it, or if so, who received it and what that person did nor did not do. The plaintiff also made complaints to the HSU in February, but the record is silent as to whether any of the defendants knew about these complaints at the time.

The evidence indicates that the first of the defendants to be involved in the complaints of fumes and cold was **Pusich**, the security supervisor and a captain. Pusich testified that she was aware of the fumes in 2013-2014, and that they must have come to her attention through an inmate telling her about them. Ledford claimed to have written to Pusich on February 4, 2014, with no response. Piester said that he had contacted Pusich on February 11, 2014, without response. The plaintiff wrote to Pusich on February 16, 2014, with no

47

response. Pusich had no recollection of the plaintiff's complaint, did not recall responding to it but speculated that she must have received it and forwarded it to "somebody." Pusich appears to acknowledge having received Piester's complaint but testified that "it was determined" that the fumes didn't present a health risk. When asked how she came to that conclusion, Pusich made a vague indication that it must have been the result of a "memo" forwarded by Basten; presumably, she was referring to Basten's February 27, 2014 email to various staff members, to which Basten attached Mattison's report.

At least three inmates indicate that they wrote to Pusich about their suffering from fumes and cold. They wrote to her between February 4 and February 16, 2014. There is no way to determine whether Pusich received the letters from Ledford and the plaintiff, or if so, when she received them. Pusich appears to recall only one of the letters—Piester's. She says that she would have told Basten about any such complaints, and she speculates that she concluded that the problem had been resolved because of a memo she received from Basten via email, but Basten sent that email two weeks after Piester claims to have written to Pusich, and eleven days after the plaintiff says he wrote to her. Could a reasonable jury conclude by a preponderance of the evidence that for much of February, Pusich had to have known that the inmates were being exposed to the fumes and the cold, but did nothing? It is a close call. But Pusich's testimony that she would have informed Basten of any complaints is corroborated by Basten's deposition testimony and is undisputed. There is no way to know from this evidence when Pusich learned

that inmates were complaining about fumes and cold, how long it took her to report the problem to Basten (although the record shows that as of February 18, Basten was aware of the problem) or whether she received any additional complaints between the time she reported the issue to Basten and the time she learned that it had been "resolved," as she put it. While it is close, the court concludes that there is not sufficient evidence for a reasonable jury to conclude that Pusich knew of a risk to the plaintiff and ignored it or failed to act.

The next defendant is **Leurquin**, the correctional officer who also acted as the health and safety officer. Ledford said that on February 11, he'd spoken to Zuge and Laufenberg, who claimed to have spoken to the health and safety officer but that the health and safety officer "didn't appear to take it seriously." On February 18, complaint examiner Martin spoke with Leurquin, who confirmed that Zuge and Laufenberg had told him about the inmate complaints. Leurquin also told Martin that he didn't remember any particular inmate making complaints to him, but that Ledford may have mentioned something to him in passing. At his deposition, Leurquin testified that Zuge had told him about the fumes, shortly before Ledford had complained to him about them. He testified that he'd discussed the issue with buildings and grounds manager Chris Timmers, who later followed up by telling Leurquin that he had performed an air quality control test and that everything had been fine. Leurquin also testified that as a result of hearing about the fumes from Zuge and Ledford, the Health and Safety Committee had done a walk-through of the North Cell Hall, but hadn't noticed any fumes. There is no evidence in

the record to indicate that anyone complained to Leurquin, or conveyed other people's complaints to Leurquin, about the temperature in the cell hall.

A reasonable jury could not conclude that Leurquin knew of a risk to the plaintiff but did nothing. Leurquin did do something—he discussed the situation with Timmers, who said he'd look into it. He also conducted a walk-through of the North Cell Hall. Leurquin relied on Timmer's representation that he had conducted an air quality assessment that revealed no problems (contrary to the defendants' admission that no air quality control tests were performed), but there is no evidence in the record to indicate that he shouldn't have done so. And while Leurquin couldn't remember at his deposition whether there was machinery operating outside the cell hall when the Health and Safety Committee did its walkthrough, he testified that the committee did not encounter any exhaust.

Pusich testified that she would have told **Basten**, the correctional services manager, about any complaints she received from inmates. She speculated that she may have forwarded the plaintiff's February 16, 2014 letter to Basten. Basten testified that a captain (she does not say, but it may have been Pusich, who was a captain) informed her that officers were complaining about fumes in the cell hall; she indicated that she met with Timmers to discuss the issue. Timmers told Basten that the air handlers were being turned off to address the problem, and that the cell hall was being painted at the same time. Basten testified that she recommended that, with the air handlers off, there should be no painting, but that it was Timmers who made the decision to

turn off the air handlers. She testified about having the fans blowing and testified that the air handlers were turned off only during construction.

Basten testified that she raised the issue at the construction meeting, which she thought took place within a week or so of her speaking to Timmers. That meeting occurred on February 18. At that meeting (where Timmers and Mattison also were present), Basten reported that she'd received notice that an inmate had complained to OSHA. (This would not have been the plaintiff's complaint to OSHA, which was not received until February 20.) It appears that at this point, Basten turned the issue over to Mattison, as chief engineer, to investigate. She also, however, checked with the HSU (at Mattison's request) to see whether any inmates had made fumes-related health complaints. She was told that there were no such complaints. Mattison issued his report on February 20; the record does not reveal when Basten received it. But seven days later, on February 27, Basten forwarded Mattison's memo to several staff members, including Pusich. She recommended that the painting in the cell hall stop, so that the windows could be opened and the air handlers wouldn't have to be turned off.

The evidence shows that Basten responded to the inmate complaints as to the fumes. She talked to Timmers, who told her about shutting down air handlers and using fans. She didn't simply accept this; she brought up the issue at the construction meeting, also reporting that she'd been contacted by OSHA. She took steps to have Mattison investigate. Once she received Mattison's report, she disseminated it to staff with recommendations to stop

51

the painting, open windows and use the air handlers. A reasonable jury could not conclude that Basten knew of a risk to the inmates but did nothing. As to the temperature, there is no evidence in the record to indicate that Basten was aware that the inmates were complaining of cold. She believed that Timmers was monitoring the temperature daily. She was not aware that if the air handlers were off, the heat also was off. A reasonable jury could not conclude that Basten was aware of a risk to the plaintiff but did nothing.

Several of the defendants relied on the report from **Mattison** to reach the conclusion that steps were being taken to mitigate the exhaust problem. It appears that Mattison first learned of the complaints about the exhaust at the February 18, 2014 construction meeting. In response, he conducted an investigation. Mattison stated in the February 24, 2014 report of that investigation that he'd talked with maintenance staff and contractor management who'd worked in the area near the bath house in the previous month, and had learned that the construction workers were using diesel-fueled machinery. He said he'd learned that if that diesel-fueled machinery was operating near air in takes in the east wall of the North Cell Hall, the maintenance staff would shut down that air intake. Mattison also said that he asked "management"—apparently Basten, according to her account—to go through the HSU logs for the month prior to the construction meeting, to see if there were any records of inmate complaining of nausea or vomiting due to fumes. He claimed that "the nurse" said there were no such complaints. From these pieces of information, Mattison concluded that it was "possible" that

52

diesel exhaust fumes "may" have gotten into the North Cell Hall during construction, but said that given the "volume of outside air flow" that would have come in relative to the amount of exhaust that "would have been present, it is not expected" that "dangerous" amounts of fumes or "combustion by-products" would have gotten in. He also opined that the project had reached a point that further "issues" regarding diesel exhaust "are not expected." Mattison reported that the contractors had agreed that if they did use the diesel equipment near the air intakes, they'd use "exhaust scrubbers" to mitigate the effects of the exhaust. He speculated that once roofing started, the adhesive used for the roofing had the potential to create a fume problem, but said that the contractors had agreed to work with the prison staff to secure the air intakes near the areas where the roofing work would be taking place. Mattison's conclusion was that ventilation systems have operated as designed and no lasting health effects have occurred," and recommended "no further action beyond that described above."

No reasonable jury could conclude that Mattison did *nothing* when he learned about the exhaust fumes. He clearly did *something*—a few somethings, in fact. He talked to the prison maintenance staff. He talked to the contractors working on the bath house. He asked for information about health complaints to the HSU. He extracted agreements from the contractors to take measures to mitigate the exhaust. He reported back to prison management. No jury could conclude that Mattison was deliberately indifferent in the "knew about the risk but ignored it" sense.

As complaint examiner Martin opined, there are flaws with Mattison's investigation, and with his conclusions. Mattison did not speak with any of the complaining inmates, or with the corrections staff (such as Zuge and Laufenberg) who worked in the affected area every day. He did not speak with medical professionals to determine whether any inmates had complained of symptoms that could have been caused by inhaling fumes—he asked only whether any inmates had attributed their symptoms to fumes in reports to the HSU. He was not a doctor; while he opined that no lasting health effects had occurred, he had no professional basis for rendering that opinion. He does not appear to have conducted an investigation over time—he learned of the complaints on February 18 and conducted his investigation two days later. He appears to have taken the word of the (unidentified) maintenance staff as to conditions on the ground, combined that with the absence of any inmate-identified fumes symptoms, and concluded that the agreements he'd extracted from the contractors was sufficient to resolve any issues.

Of note is the fact that the HSU told Basten, who told Mattison, that "we didn't have any complaints that [HSU] knew of that anybody referenced to the fumes in the cell hall." Dkt. No. 214, transcript p. 36 at lines 10-13. The record contains the plaintiff's interview request to the HSU, which he wrote February 12 and which the HSU received on February 13—a week before Mattison conducted his investigation and wrote his report. The record sheds no light on why HSU staff would have told Basten that there had been no inmate complaints about fumes-related symptoms, when the plaintiff himself had

54

made such a complaint. Perhaps no one in the HSU checked; whoever Basten spoke to may have relied on memory. But there is no evidence that *Mattison* would have been aware that the HSU's representation was inaccurate (or that Basten would have been, or that matter). Basten and Mattison relied on the representation of someone on the HSU staff that no inmates had complained of fume-related symptoms.

Martin criticized Mattison's investigation and conclusions, as does the plaintiff. But for the purposes of an Eighth Amendment deliberate indifference claim, the question is not whether Mattison conducted a perfect investigation, or whether he could have done better. "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" Arnett v. Webster, 658 F.3d 742, 751 (7th Cir. 2011) (quoting Collignon v. Milwaukee Cty., 163 F3d 982, 988 (7th Cir. 1998)). "The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard." Perez v. Fenoglio, 792 F.3d 768, 777 (7th Cir. 2015) (citing Farmer v. Brennan, 511 U.S. 825, 836 (1994)).

As a matter of law, no reasonable jury could conclude that Mattison acted with something akin to reckless disregard in conducting his investigation and coming to the conclusions he reached. He could have done more, but that does not prove reckless disregard to the risks posed by the exhaust fumes. And again, the record does not contain evidence that Mattison knew about the complaints regarding temperature in the cell hall

55

The final State defendant is Warden **Baenen**. A reasonable jury could not conclude that Baenen knew of a risk but disregarded it. Baenen talked with Basten about the exhaust issue, and followed up with her more than once. Baenen is the one who reversed Martin's rejection of the group complaint, sending it back to the complaint examiner's office for further investigation because he felt that the plaintiff and the other inmates in the group had not been properly heard. When he decided to dismiss the complaint in March, despite Martin's recommendation that it be affirmed, he did so because he'd reviewed Mattison's report and believed that the problem was being addressed. Could Baenen have done more? Could he have gone to the cell hall himself and walked it on different dates at different times, to see if he detected fumes? Could he have talked with the complaining inmates? He could have done these things. But he had complaint examiner Martin's report, and Martin *had* done these things. He also relied on Mattison's report, as did Pusich and Basten. A reasonable jury could not conclude that Baenen acted with something akin to reckless disregard.

The court concedes that this is a difficult case. The inmates were subjected to diesel exhaust fumes for an extended period. The inmates lived in the North Cell Hall twenty-four hours a day, seven days a week, unlike guards or prison staff. They would have been exposed to these fumes more regularly, more consistently and more persistently than Zuge, Laufenberg or anyone else involved in the situation. The fact that some prison staff—Zuge and Laufenberg—claimed they didn't suffer from headaches, nausea or other

56

symptoms could well be attributed to their more limited exposure. It is concerning that Pusich, Basten and Baenen did not visit the cell hall themselves—more than once, over time—to see if they could detect the problem the inmates reported. It is concerning that Basten, Mattison and Baenen didn't interview the complaining inmates, as Martin had. It is concerning that the HSU incorrectly reported that no inmate had complained of symptoms related to the construction work. It is even concerning that Pusich did not stamp inmate letters "received," or write on them the date that she received them, or acknowledge receipt in any way.

Also befuddling is the fact that it apparently didn't occur to maintenance staff that if they turned off the air handlers in the middle of the Wisconsin winter (and a particularly brutal winter), less heat would be pumped into the cell block and the inmates would be exposed to cold. While it is good that the maintenance staff tried to address the exhaust problem, it is perplexing that it didn't seem to occur to that staff that the "cure" might be as bad as, or worse than, the "disease." Chris Timmers, the buildings and grounds manager who appears to have been responsible for the idea of turning off the air handlers, has passed away, and none of the other defendants are members of the maintenance staff. The record does not indicate what the maintenance staff thought process was regarding the impact their "solution" might have on the cell hall temperature.

One might look at all these facts and conclude that staff at Green Bay mishandled the fumes situation, and that this arguable mishandling

unnecessarily exposed inmates such as the plaintiff to health issues and cold. The inmates should not have been exposed to the fumes and the cold. The question is whether a reasonable jury could find that *these* defendants were deliberately indifferent to the risks, and to the inmates' suffering, under the Eighth Amendment. The court concludes that a reasonable jury could not reach that conclusion. The court will grant the State defendants' motion for summary judgment.

Because the court is granting summary judgment on the deliberate indifference claims, it need not reach the defendants' argument that they are entitled to qualified immunity. Because the court is dismissing the federal constitutional claim, it does not have supplemental jurisdiction over the state law negligence claims under 18 U.S.C. §1367.

## III.    CONCLUSION

The court **GRANTS** defendants Baenen, Pusich, Basten, Mattison and Leurquin's motion for summary judgment. Dkt. No. 206.

Dated in Milwaukee, Wisconsin this 30th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**